UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Rosemary A. Gilroy

    v.                                     Civil No. 07-cv-300-JL
                                         Opinion No. 2009 DNH 129
James Kasper, Trustee of the
Ponemah Trust, et al.


**MEMORANDUM ORDER**

This case involves allegations of, among other things, fraudulent lending practices by a private lender. Pro se plaintiff Rosemary A. Gilroy, proceeding in forma pauperis, brought suit against the defendants, the Ponemah Trust and its trustee, James Kasper (collectively "the Ponemah Trust"), Alan H. Segal, and Kurt R. McHugh, alleging that they engaged in fraudulent lending practices related to two condominium units which Gilroy owns in Amherst, New Hampshire.[1]

---

[1] Gilroy's complaint did not name Segal or McHugh as defendants. Upon the court's customary preliminary review in pro se in forma pauperis cases, the court construed Gilroy's complaint to allege claims against Segal and McHugh, who were attorneys representing the Ponemah Trust when the loan was issued. See Report and Recommendation, document no. 6. The court ordered service upon Segal and McHugh. The United States Marshal attempted, but was unable, to complete service due to an incorrect address. To this day, Segal and McHugh have not been served in this case. Noting the lack of service upon them, Segal and McHugh nevertheless joined in the motion for summary judgment. Addressing the lack of service at this stage is unnecessary, however, as summary judgment is granted in the defendants' favor.

The defendants filed a motion to dismiss all claims against them.  <u>See</u> Fed. R. Civ. P. 12(b)(6).  Because the defendants submitted additional materials beyond the pleadings, the court denied the motion to dismiss without prejudice, informing the defendants that they could re-file their motion as a motion for summary judgment.  <u>Order</u>, doc. no. 36; <u>see</u> Fed. R. Civ. P. 56. That motion for summary judgment is now before the court.  The defendants seek dismissal of all claims and an award of costs and attorney's fees.

This court has jurisdiction over this action under 28 U.S.C. § 1332(a)(1) (diversity).  After oral argument, the defendants' motion for summary judgment is granted, and their request for attorney's fees denied.  As discussed <u>infra</u>, taking all reasonable inferences in favor of Gilroy, the undisputed facts demonstrate that she can not prevail on her claims as a matter of law.

**I.   Applicable legal standard**

Summary judgment is appropriate if, viewing the record in a light most favorable to the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see</u> <u>Fiacco v. Sigma Alpha Epsilon</u>

2

Fraternity, 528 F.3d 94, 98 (1st Cir. 2008). In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the non-moving party. Est. of Bennett v. Wainwright, 548 F.3d 155, 165 (1st Cir. 2008).

The moving party must first aver "'an absence of evidence to support the nonmoving party's case.'" Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (internal quotations omitted)). "'The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material'". Id. The non-moving party "may not defeat a properly focused motion for summary judgment by relying upon mere allegations or evidence that is less than significantly probative." Id.

Accordingly, summary judgment may be appropriate if the nonmoving party relies only upon "'conclusory allegations, improbable inferences, and unsupported speculation.'" Maldonado-Denis, 23 F.3d at 581 (quoting Median-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)); see Estate of Bennett, 548 F.3d at 165; Fiacco, 528 F.3d at 98. Importantly, "pro se status [will] not free a litigant in a civil case of the obligation to comply" with these rules. Ruiz Rivera v. Riley, 209 F.3d 24, 28 n.2 (1st Cir. 2000).

**II.   Background**

Viewed under the summary judgment standard, the record reveals the following facts.[2]  See Fed. R. Civ. P. 56(c).  On March 1, 2000, Gilroy purchased five office condominium units (Units 1 through 5) in Amherst, New Hampshire.  She converted Unit 1 into a residential condominium and now lives there.  In 2004, Gilroy granted mortgages on Units 1, 2, and 4 to Ameriquest ("Ameriquest loans") to secure loans made by Ameriquest that are now in default.  Gilroy used the funds to begin converting the units for resale as residential condominiums.  But Gilroy failed to make timely payments on the Ameriquest loans and they went into arrears.

In August of 2005, Gilroy needed additional funds to complete the renovations on Units 3 and 5, which were

---

[2]Gilroy's complaint is not verified and she did not submit an affidavit with her objection.  In addition, many of the documents she did submit with her pleadings have little relevance to her remaining claims.  Gilroy belatedly submitted an affidavit with her surreply that contained several statements disputing the evidence presented by the defendants on summary judgment.  Her statements were not made on personal knowledge and were unsupported by evidence in the record.  The statements in her affidavit, therefore, do not constitute competent evidence sufficient to establish a genuine dispute of material fact for purpose of surviving summary judgment.  See Fed. R. Civ. P. 56(e)(2), L.R. 7.2(b)(2).  Moreover, the court questioned Gilroy at oral argument regarding the statements in her affidavit in an effort to assist her, as a pro se litigant, in developing the summary judgment record.  As explained infra, she stated nothing at oral argument that created a genuine issue of material fact.  Because of Gilroy's pro se status, the court accepts her surreply affidavit as part of the summary judgment record.

unencumbered. She retained Dan Monroe, a mortgage broker, to help her obtain financing for the project. Gilroy provided Monroe with her financial statement and an operating budget outlining her monthly expenditures for the next year. These documents indicated that her only income was from social security benefits, that Ameriquest held mortgages on the other units (1, 2, and 4), that she owed $15,000 in arrears on those loans, and that her expenditures for the next year totaled $230,492, which included, among other things, payments on the Ameriquest loans, arrears owed to Ameriquest, and costs to complete the renovations on Units 3 and 5.

Gilroy was unable to obtain conventional bank financing and sought financing from the Ponemah Trust, a private lender. An agent for the Ponemah Trust inspected the exterior of the property and determined that the fair market value of Units 3 and 5 combined was $300,000.[3] The Ponemah Trust offered Gilroy a loan, secured by a mortgage on both Units 3 and 5, for $125,000. After Gilroy asked for a larger loan, she and the Ponemah Trust agreed to increase the amount to $150,000. On September 29, 2005, Gilroy executed a promissory note and mortgage on Units 3 and 5 to the Ponemah Trust in the amount of $150,000 ("Ponemah loan"). Under the terms of the loan, the first twelve monthly

---

[3]Gilroy disputes the fair market value of her units but fails to offer competent evidence to support her claim.

payments would be applied only to interest.  Gilroy intended to complete the units and sell them within a year.

Attorney McHugh, a defendant in this case, represented the Ponemah Trust at the loan closing.  Although Gilroy began to claim, late in the oral argument on these motions, that she showed McHugh the financial statement and budget at the closing, the summary judgment record is devoid of any such claim (denied by McHugh in his affidavit) or any evidence to support it.  All indications of, and inferences from, the summary judgment record are that the Ponemah Trust extended the loan based on the value of the collateral (Units 3 and 5), and not on Gilroy's personal financial position.

Gilroy used a portion of the Ponemah loan funds to make payments on the Ameriquest loans.  Unable to finish renovating or sell Units 3 and 5, she stopped making payments on the Ponemah loan in the spring of 2006.  In July 2006, after noticing a foreclosure notice on the Ameriquest-financed units in the newspaper, Gilroy filed a Chapter 13 bankruptcy petition, which was ultimately dismissed.[4]  Following a bankruptcy creditors' meeting on January 10, 2007, Gilroy approached McHugh seeking additional funding from the Ponemah Trust to complete the units. McHugh told Gilroy that he would discuss the possibility of

---

[4]Ameriquest never proceeded with the foreclosure on Units 1, 2 and 4.

additional funding with the Ponemah Trust and requested that Gilroy provide estimates from contractors showing the costs for completing the remainder of the work on the units as well as documentation regarding the improvements required to obtain occupancy permits from the Town of Amherst.

Gilroy promptly provided estimates to McHugh, but they bore dates from early 2006.  McHugh soon responded that the estimates were outdated and explained that the Ponemah Trust was "not willing to render a decision on additional financing" until new estimates were provided to him.  Gilroy responded that the estimates took a while to obtain and that she wished to move forward quickly.  McHugh explained that the Ponemah Trust needs "information or documentation to determine whether it would be a good idea to extend more funds to a borrower that has not made payments on the current loan[] in some time."  McHugh further explained that he was "just gathering information for the lender to see if an additional mortgage would assist in ultimately paying off the current mortgages."

In February or March of 2007, Gilroy forwarded McHugh a copy of a letter from the Town of Amherst listing the improvements necessary to obtain certificates of occupancy.  Around this time, another private lender, not associated with the Ponemah Trust or McHugh, expressed willingness to lend Gilroy additional funds, secured by a mortgage on Units 3 and 5.  McHugh told Gilroy that

the Ponemah Trust wanted to wait and see if this separate financing was provided.  It was not.  McHugh then informed Gilroy that the Ponemah Trust would not extend additional financing to her.  Gilroy did not complete the renovations.  Neither Ponemah Trust nor Ameriquest has foreclosed on the mortgages securing loans to Gilroy.

**II.  Analysis**

Gilroy alleges fraud, intentional infliction of emotional distress, and violations of the New Hampshire Consumer Protection Act, Revised Statutes Annotated ("RSA") 358-C ("CPA").[5]  The defendants seek summary judgment on all counts.

**A.  Fraud**

Gilroy claims that the defendants defrauded her by intentionally leading her to believe for several months in 2006 and 2007 that the Ponemah Trust would lend her additional funds when the trust never intended to do so, causing Gilroy to rely upon this representation and forgo additional avenues of financing during this time.  To prove her fraud claim, Gilroy

---

[5]To the extent Gilroy's complaint also contained claims for discrimination, "violation of personal injury law," harassment, and violations of Federal Consumer Protection laws, Gilroy Complaint, doc. no. 1, these claims were dismissed under Judge Muirhead's report and recommendation, approved by the court without objection.  Report and Recommendation, doc. no. 6; Amended Order, doc. no. 12.

must produce evidence showing that the defendants "made a representation with knowledge of its falsity or with conscious indifference to its truth with the intention to cause [her] to rely upon it." Van Der Stok v. Van Voorhees, 151 N.H. 679, 682 (2005).  She has not.

Viewed in a light most favorable to Gilroy, the summary judgment record contains no indication that any of the defendants led her to believe that additional financing was guaranteed from the Ponemah Trust, much less that they did so without any intention of providing it.  The only evidence produced on this issue by either party were copies of emails between Gilroy and McHugh.[6]  In the emails, McHugh states that the Ponemah Trust would not "render a decision on additional financing" until updated estimates were provided to him, that the Ponemah Trust needed this information "to determine whether it would be a good idea to extend more funds," and that McHugh was "just gathering information for the lender to see if an additional mortgage would assist in ultimately paying off the current mortgages" (emphasis added).  These emails--submitted and relied upon by Gilroy herself--do not contain any information to suggest that defendants intentionally led Gilroy to falsely believe that the Ponemah Trust would extend additional financing.  The defendants are entitled to summary judgment on this claim.

---

[6] Neither party contests the admissibility of the emails.

**B.   Intentional Infliction of Emotional Distress**

The defendants are also entitled to judgment as a matter of law on Gilroy's emotional distress claim. Taking those facts which are properly supported by competent evidence in a light most favorable to Gilroy, Gilroy cannot sustain her burden of proof to show that the defendants, "by extreme and outrageous conduct[,] intentionally cause[d] [her] severe emotional distress." Konefal v. Hollis/Brookline Coop. Sch. Dist., 143 N.H. 256, 260 (1998).

Gilroy claims that she suffered from a number of ailments as a result of the stress which the defendants caused her, due to the "looming foreclosure" of her premises. There is no evidence in the record that the defendants ever filed or threatened foreclosure on Units 3 or 5. By her own allegations, the only foreclosure Gilroy ever faced were initiated not by the Ponemah Trust on Units 3 and 5, but by Ameriquest on Units 1, 2 and 4.

Even assuming that this would not be fatal to Gilroy's emotional distress claim, the defendants would still be entitled to summary judgment because Gilroy has not even alleged, much less submitted summary-judgment evidence, of conduct "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"

Mikell v. Sch. Admin. Unit No. 33, 972 A.2d 1050, 1055 (N.H. 2009) (quoting Restatement (Second) of Torts § 46 cmt. *d*, at 73 (1965)).  The defendants' conduct, even with the ill will attributed to them by Gilroy, does not constitute the type of extreme and outrageous conduct necessary to impose liability for intentional infliction of emotional distress.  See Morancy v. Morancy, 134 N.H. 493, 496 (1991) (noting that conduct must be "so severe that no reasonable [person] could be expected to endure it" (quoting Restatement (Second) of Torts § 46, comment j.)).  Summary judgment is granted to the defendants on Gilroy's claim for intentional infliction of emotional distress.

**C.   New Hampshire Consumer Protection Act**

As construed by Judge Muirhead without objection by Gilroy, her Consumer Protection Act claim is that the defendants engaged in unfair and deceptive trade practices when they "(1) provided her with a mortgage on her property knowing that she did not have the means to make the required payments; (2) refused to extend her additional funds knowing that would prevent her from being able to repay the loans by [selling] her condominiums; (3) and conducted the transaction in an intentionally deceptive manner to prevent her from seeking alternative financing."  Report and Recommendation, doc. no. 6, at 12-13.

To prove her CPA claim, Gilroy must show that the defendants used an "unfair or deceptive act or practice in the conduct of any trade or commerce" within the state of New Hampshire. RSA 358-A:2. The CPA contains a nonexhaustive list of prohibited acts. Id. For conduct not specified under the CPA, the court applies "the rascality test" and asks whether the conduct "attain[s] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." State v. Sideris, 157 N.H. 258, 263 (2008); Milford Lumber Co. v. RCB Realty, 147 N.H. 15, 17 (2001).

### 1.   Ability to make mortgage payments

Gilroy alleges that the defendants made the $150,000 loan knowing that she would not be able to make payments on it. Specifically, she argues (but presents no evidence suggesting)[7] that because the defendants were aware of her income, her monthly payment amount to Ameriquest, and the money she owed in arrears to Ameriquest, the defendants should have known that the $150,000 loan would be insufficient to cover these expenditures, the

---

[7] Again, although there is evidence in the summary judgment record that Gilroy provided her budget and personal financial information (specifying her debt to Ameriquest) to mortgage broker Monroe, there is no competent evidence that that information was provided--by Gilroy, Monroe or anyone else--to the defendants. All indications from the undisputed evidence are that the Ponemah Trust loan was made based on the value of the collateral.

12

renovation costs on Units 3 and 5, and the interest payments on the Ponemah loan.

Gilroy's operating budget indicated that the remaining improvements on Units 3 and 5 would cost a total of $68,500 and her complaint alleges that she needed $100,000 to complete the renovations.  Based on upon these amounts, the $150,000 loan was sufficient for Gilroy to finish renovations on Units 3 and 5 and make interest-only payments on the Ponemah loan for one year. Gilroy points to her additional expenses, outlined in her operating budget, and argues that the loan was not sufficient to cover these expenses and that the defendants must have known that she would use the Ponemah loan funds to pay Ameriquest to keep her other units out of foreclosure.  Even accepting that the defendants were aware of Gilroy's income and expenditures--and there is no evidence in the summary judgment record to support that inference--it does not follow that the defendants knew that Gilroy would use the majority of the funds from the Ponemah loan, given for the purpose of renovating Units 3 and 5, to pay a different lender who held mortgages on Units 1, 2, and 4.  There is simply no evidence in the record that the defendants knew that she would be unable to make payments on the Ponemah loan at the time they made it to her.

### 2. Additional Financing

Gilroy claims that the defendants fraudulently and deceptively led her to believe that the Ponemah Trust would provide additional financing and then refused to do so, knowing that this would prevent her from repaying all her loans. This claim is nearly identical to Gilroy's fraud claim. As discussed above, McHugh informed Gilroy on several occasions that additional financing from the Ponemah Trust was not guaranteed. Cf. Barrows, 141 N.H. at 390 (upholding trial court's finding that the defendants did not violate the CPA because "although the [defendants] at times did alter the terms of prior agreements, all of these offers were explicitly tentative and subject to further conditions which were not fulfilled") (internal quotation marks omitted)). McHugh also informed Gilroy that the Ponemah Trust had to evaluate whether lending her additional funds was a good investment, particularly since she had stopped making payments on the Ponemah loan nearly a year earlier.

Gilroy produces no evidence that disputes the defendants' evidence that neither the Ponemah Trust nor its representatives promised a second round of funding, or intentionally led Gilroy to believe that additional financing would be forthcoming. There is no evidence in the summary judgment record that the defendants violated the CPA by intentionally misleading Gilroy, or unfairly or deceptively refused to lend her additional funds. The

defendants are entitled to judgment on the CPA claims as a matter of law.

**IV.   Additional matters**

**A.   Requests to strike**

In their reply, the defendants request that Gilroy's objection be stricken for failure to comply with the page limit requirement of Local Rule 7.1(a)(3) and for failure to include supporting documentation as required by Local Rule 7.1(a)(2). The court will not entertain the defendants' request because it was not submitted as a separate motion as required under the Local Rules.  See L.R. 7.1(a)(1), 7.2(c).

In her surreply, Gilroy requests that the defendants' motion for summary judgment, memorandum, reply, and affidavits be stricken for failure to comply with Local Rules 7.1(a), (b), and (c).  Because Gilroy likewise did not submit her request in the form of a separate motion, her request will not be entertained by the court.  See L.R. 7.1(a)(1), 7.2(c).  Even if the court were to entertain her request, however, it is without merit.

**B.   Costs and attorney's fees**

Within their motion for summary judgment, the defendants request that they be awarded costs and attorney's fees.  The court will not entertain the defendants' request for attorney's

15

fees for the same reason.  It was not submitted in a separate motion and does not otherwise comply with Local Rule 54(d)(2).  See L.R. 54(d)(2) ("A claim for attorney's fees . . . must be made by motion . . . [and must] specify the judgment and the statute, rule, or other grounds entitling the movant to the award . . . ."); L.R. 7.1(a)(1).

As the prevailing parties, the defendants are entitled to costs, excluding attorney's fees.  See L.R. 54.1(a) ("Unless otherwise ordered by the court, the prevailing party shall be entitled to costs other than attorney's fees.").  Gilroy's in forma pauperis status does not shield her from liability for costs.  L.R. 4.2(g) ("The granting of an application to proceed in forma pauperis does not waive the applicant's responsibility to pay the expenses of litigation which are not waived by 28 U.S.C. §§ 1825 and 1915.").  While the court does not doubt Gilroy's genuine belief in the merit of this case, the court finds that her claims are frivolous.  Because Gilroy appears to lack sufficient understanding of the law to recognize the frivolousness of her claims, however, the court declines to award costs.  See Papas v. Hanlon, 849 F.2d 702, 704 (1st Cir. 1988) ("The exercise of authority to tax costs under Rule 54(d) is discretionary when [in forma pauperis status] is involved.").

**III. Conclusion**

For the foregoing reasons, the defendants' motion for summary judgment (document no. 39) is GRANTED. The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  August 31, 2009

cc:   Rosemary Gilroy, pro se
      Steven F. Hyde, Esq.
      Alan Segal, pro se
      Kurt McHugh, pro se